Case No. 22-1639

_____

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

_____

National Police Association, Inc.
*Plaintiff-Appellant*,

v.

Gannett Co., Inc. and Associated Press, Inc.,
*Defendants-Appellees.*

_____

On Appeal from the United States District Court
For the Southern District of Indiana, Indianapolis Division,
Case No. 1:21-cv-01116-RLM-DLP,
The Honorable Robert L. Miller, Jr., U.S. District Judge

_____

**BRIEF OF AMICI CURIAE THE REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS AND 39 MEDIA ORGANIZATIONS IN
SUPPORT OF DEFENDANTS–APPELLEES URGING AFFIRMANCE**

_____

Katie Townsend
  *Counsel of Record for Amici Curiae*
Shannon A. Jankowski*
Charles Hogle*
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310
ktownsend@rcfp.org

*Of counsel

## CORPORATE DISCLOSURE STATEMENT
## AND CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

American Broadcasting Companies, Inc. is an indirect, wholly-owned subsidiary of The Walt Disney Company, a publicly traded corporation.

Association of Alternative Newsmedia has no parent corporation and does not issue any stock.

The Atlantic Monthly Group LLC is a privately-held media company, owned by Emerson Collective and Atlantic Media, Inc.  No publicly held corporation owns 10% or more of its stock.

Axios Media Inc. is a privately owned company, and no publicly held company owns 10% or more of its stock.

Boston Globe Media Partners, LLC, is a privately held company. No publicly held corporation owns 10% or more of its stock.

BuzzFeed Inc. is a privately owned company, and National Broadcasting Company (NBC) owns 10% or more of its stock.

Californians Aware is a nonprofit organization with no parent corporation and no stock.

The Center for Investigative Reporting (d/b/a Reveal) is a California non-profit public benefit corporation that is tax-exempt under section 501(c)(3) of the Internal Revenue Code. It has no statutory members and no stock.

Courthouse News Service is a privately held corporation with no parent corporation and no publicly held corporation holds more than 10 percent of its stock.

The E.W. Scripps Company is a publicly traded company with no parent company. No individual stockholder owns more than 10% of its stock.

First Amendment Coalition is a nonprofit organization with no parent company.  It issues no stock and does not own any of the party's or amicus' stock.

First Look Institute, Inc. is a non-profit non-stock corporation organized under the laws of Delaware. No publicly-held corporation holds an interest of 10% or more in First Look Institute, Inc.

Freedom of the Press Foundation does not have a parent corporation, and no publicly held corporation owns 10% or more of the stock of the organization.

Hearst Corporation is privately held and no publicly held corporation owns 10% or more of Hearst Corporation.

Informed California Foundation, d/b/a Open Vallejo, is a California nonprofit corporation and an educational public charity organized pursuant to section 501(c)(3) of the U.S. Code.  It issues no stock.

The Investigative Reporting Workshop is a privately funded, nonprofit news organization based at the American University School of Communication in Washington. It issues no stock.

Los Angeles Times Communications LLC is wholly owned by NantMedia Holdings, LLC.

The McClatchy Company, LLC is privately owned by certain funds affiliated with Chatham Asset Management, LLC and does not have publicly traded stocks.

The Media Institute is a 501(c)(3) non-stock corporation with no parent corporation.

The Foundation for National Progress, dba Mother Jones, is a nonprofit, public benefit corporation. It has no publicly-held shares.

The National Press Club is a not-for-profit corporation that has no parent company and issues no stock.

The National Press Club Journalism Institute is a not-for-profit corporation that has no parent company and issues no stock.

National Press Photographers Association is a 501(c)(6) nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

New England Newspaper and Press Association, Inc. is a non-profit corporation. It has no parent, and no publicly held corporation owns 10% or more of its stock.

The New York Times Company is a publicly traded company and has no affiliates or subsidiaries that are publicly owned. No publicly held company owns 10% or more of its stock.

The News Leaders Association has no parent corporation and does not issue any stock.

News/Media Alliance is a nonprofit, non-stock corporation organized under the laws of the commonwealth of Virginia. It has no parent company.

Newsday LLC is a Delaware limited liability company whose members are Tillandsia Media Holdings LLC and Newsday Holdings LLC. Newsday Holdings LLC is an indirect subsidiary of Cablevision Systems Corporation. Cablevision Systems Corporation is (a) directly owned by Altice USA, Inc., a Delaware corporation which is publicly traded on the

New York Stock Exchange and (b) indirectly owned by Altice N.V., a Netherlands public company.

The News Guild – CWA is an unincorporated association. It has no parent and issues no stock.

Online News Association is a not-for-profit organization. It has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

Pro Publica, Inc. ("ProPublica") is a Delaware nonprofit corporation that is tax-exempt under section 501(c)(3) of the Internal Revenue Code.  It has no statutory members and no stock.

Radio Television Digital News Association is a nonprofit organization that has no parent company and issues no stock.

Reuters News & Media Inc. is a Delaware corporation whose parent is Thomson Reuters U.S. LLC, a Delaware limited liability company. Reuters News & Media Inc. and Thomson Reuters U.S. LLC are indirect and wholly owned subsidiaries of Thomson Reuters Corporation, a publicly-held corporation, which is traded on the New York Stock Exchange and Toronto Stock Exchange. There are no intermediate parent corporations or subsidiaries of Reuters News & Media Inc. or Thomson Reuters U.S. LLC that are publicly held, and there are no publicly-held companies that own

10% or more of Reuters News & Media Inc. or Thomson Reuters U.S. LLC shares.

The Seattle Times Company: The McClatchy Company, LLC owns 49.5% of the voting common stock and 70.6% of the nonvoting common stock of The Seattle Times Company.

Slate is part of The Slate Group, a wholly owned subsidiary of Graham Holding Company.

The Society of Environmental Journalists is a 501(c)(3) non-profit educational organization.  It has no parent corporation and issues no stock.

TEGNA Inc. has no parent company, and no publicly-held company has a 10% or greater ownership interest in TEGNA, Inc.

Tribune Publishing Company is a publicly held corporation. Alden Global Capital and affiliates own over 10% of Tribune Publishing Company's common stock. Nant Capital LLC, Dr. Patrick Soon-Shiong and California Capital Equity, LLC together own over 10% of Tribune Publishing Company's stock.

The Tully Center for Free Speech is a subsidiary of Syracuse University.

Amici curiae have not appeared earlier in this case. Counsel of record for amici curiae is Katie Townsend of the Reporters Committee for Freedom of the Press.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT AND CIRCUIT
RULE 26.1 DISCLOSURE STATEMENT ...................................................ii

TABLE OF AUTHORITIES.......................................................... x

IDENTITY AND INTERESTS OF AMICI AND SOURCE OF
AUTHORITY TO FILE ............................................................ 1

INTRODUCTION ................................................................ 3

ARGUMENT .................................................................... 4

    I.   The continued-publication rule proposed by NPA would vitiate
        the single-publication rule and the fair-report privilege. ......................... 4

    II.  The continued-publication rule proposed by NPA would have a
        profound chilling effect on constitutionally protected speech............... 10

CONCLUSION ................................................................ 13

APPENDIX A: SUPPLEMENTAL STATEMENT OF IDENTITY
OF AMICI CURIAE .............................................................. 15

CERTIFICATE OF COMPLIANCE ......................................... 29

CERTIFICATE OF SERVICE.................................................. 30

# TABLE OF AUTHORITIES

## Cases

*First Nat'l Bank of Bos. v. Bellotti*,
    435 U.S. 765 (1978) .................................................................. 10

*Lovell v. City of Griffin*,
    303 U.S. 444 (1938) .................................................................. 10

*Mills v. Alabama*,
    384 U.S. 214 (1966) .................................................................. 10

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964) .................................................................. 13

*Nat'l Police Ass'n, Inc. v. Gannett Co.*,
    No. 1:21-cv-01116-RLM-DLP, 2022 WL 594918
    (S.D. Ind. Feb. 28, 2022) .................................................... 5, 6, 8

*Pack v. Middlebury Cmty. Schs.*,
    990 F.3d 1013 (7th Cir. 2021) ............................................... 4, 5

*Patten v. Smith*,
    360 N.E.2d 233 (Ind. Ct. App. 1977) ........................................ 5

*Pippen v. NBCUniversal Media, LLC*,
    734 F.3d 610 (7th Cir. 2013) ............................................... 10, 13

*Saxbe v. Wash. Post Co.*,
    417 U.S. 843 (1974) .................................................................. 10

## Other Authorities

Clara Hendrickson, *Local Journalism in Crisis: Why America Must Revive Its
    Local Newsrooms*, Brookings (Nov. 12, 2019),
    https://perma.cc/W9X4-GHPQ ............................................... 11

Eugene Volokh, *The Duty Not to Continue Distributing Your Own Libels*,
    97 Notre Dame L. Rev. 315 (2021) ................................. 6, 7, 8, 9

Michael M. Grynbaum, *Lawsuits Take the Lead in Fight Against Disinformation*, N.Y. Times (Feb. 6, 2021), https://nyti.ms/3uKxh6c ......................................................................... 12

Restatement (Second) of Torts § 577 ......................................................... 1, 6

Restatement (Second) of Torts § 611 ............................................................. 5

## IDENTITY AND INTERESTS OF AMICI
## AND SOURCE OF AUTHORITY TO FILE

Amici curiae have obtained consent to file this brief from all parties and therefore may file it pursuant to Federal Rule of Appellate Procedure 29(a)(2).

Amici curiae are the Reporters Committee for Freedom of the Press; American Broadcasting Companies, Inc.; Association of Alternative Newsmedia; The Atlantic Monthly Group LLC; Axios Media Inc.; Boston Globe Media Partners, LLC; BuzzFeed; Californians Aware; The Center for Investigative Reporting (d/b/a Reveal); Courthouse News Service; The E.W. Scripps Company, parent corporation to WRTV-TV; First Amendment Coalition; First Look Institute, Inc.; Freedom of the Press Foundation; Hearst Corporation; Investigative Reporting Workshop at American University; Los Angeles Times Communications LLC; The McClatchy Company, LLC; The Media Institute; Mother Jones; The National Press Club; The National Press Club Journalism Institute; National Press Photographers Association; New England Newspaper and Press Association, Inc.; The New York Times Company; The News Leaders Association; News/Media Alliance; Newsday LLC; The NewsGuild – CWA; Online News Association; Open Vallejo; Pro Publica, Inc.; Radio Television Digital News Association; Reuters News & Media Inc.; The Seattle Times Company; Slate; Society of Environmental Journalists; TEGNA Inc., parent corporation to WTHR-TV; Tribune

Publishing Company; and Tully Center for Free Speech (collectively "amici").[1]
A supplemental statement of identity and interest of the amici is included
below as Appendix A. Members of the news media frequently report on
newsworthy statements made by public officials, including statements that
criticize other public officials and figures and decry the actions of government
entities. Journalists and news organizations are able to do so, in part, because
of the combined effects of the single-publication rule and the fair-report
privilege—longstanding features of defamation law that place important
limitations on a publisher's liability for accurate reporting and, by doing so,
protect the free flow of information to the public. Here, Plaintiff-Appellant asks
this Court to adopt a novel, expanded interpretation of the Restatement
(Second) of Torts § 577 that would undercut both protections and, accordingly,
significantly burden the press's ability to report on matters of public concern.
Amici therefore write to underscore the importance of the single-publication
rule and fair-report privilege, and to highlight the negative ramifications of
adopting Plaintiff-Appellant's proposed continued-publication rule.

---

[1]     Pursuant to Federal Rule of Appellate Procedure 29(a)(4), amici state that
no party's counsel authored this brief in whole or in part, and no party,
party's counsel, or any other person, other than the amici curiae, their
members, or their counsel, contributed money that was intended to fund
preparing or submitting the brief.

## INTRODUCTION

The single-publication rule and the fair-report privilege, together, ensure that a journalist who accurately reports the statements of a public official (or public body) will not be liable for defamation merely because the same public official (or public body) later modifies or recants those statements. The continued-publication rule proposed by Plaintiff-Appellant the National Police Association, Inc. ("NPA") would gut these vital and longstanding protections. *See* Pl.-Appellant Br. ("Pl. Br.") at 16. Indeed, under NPA's proposed rule, a cause of action for defamation would accrue whenever the subject of an allegedly defamatory article provides the article's publisher with evidence that the circumstances described in (or underlying) the article have changed, such that the article, even if a wholly accurate report when published, is accurate no longer. *Id.* at 23.

Amici urge this Court to reject NPA's novel proposed interpretation of the continued-publication rule and affirm the District Court's dismissal of NPA's claims. As Defendants-Appellees correctly explain, NPA's proposed rule finds no support in the law of Indiana, in the law of this Circuit, or almost any modern court. Defs.-Appellees Br. at 15–22. What is more, NPA's proposed rule would be bad policy. If it became law, newsrooms large and small could be exposed at any time to defamation lawsuits from any person,

company, or organization who has been the subject of critical, newsworthy statements by a public official or public body that were reported on by that newsroom. Any news article published since the dawn of the internet could become a source of potential tort litigation—even articles, like those at issue here, that undisputedly contained no actionable statements at the time of publication. And any assertion of inaccuracy made by the subject of such negative reporting, even decades later, could trigger a resource-draining investigation into the veracity of the subject's claims. These burdens would disproportionately harm smaller, local newsrooms and give wealthy, well-resourced parties a means to intimidate investigative journalists with the threat of ruinously expensive, protracted litigation.

For the reasons herein, amici respectfully urge this Court to affirm the District Court's order granting Defendants-Appellees' motion to dismiss NPA's complaint.

## ARGUMENT

### I.     The continued-publication rule proposed by NPA would vitiate the single-publication rule and the fair-report privilege.

The "majority approach" to defamation claims "is to apply the single-publication rule." *Pack v. Middlebury Cmty. Schs.*, 990 F.3d 1013, 1020 (7th Cir.

4

2021).[2] Under the single-publication rule, a claim for defamation generally accrues when the allegedly defamatory statement is published. *Id.* Put differently, a purportedly harmful statement published on January 1 is either defamatory or not on January 1; January 1 is, therefore, the date on which the statute of limitations for a defamation claim based on the statement begins to run. The fair-report privilege, in turn, provides that an accurate report of a public official's statement on a matter of public concern is not actionable as defamation, regardless of whether the statement itself is true. Restatement (Second) of Torts § 611; *see also Patten v. Smith*, 360 N.E.2d 233, 236 (Ind. Ct. App. 1977) (recognizing "[t]he privilege attached to the reporting of public proceedings").

The single-publication rule and the fair-report privilege dispose of NPA's claims. NPA does not dispute that on the date the allegedly defamatory articles were published, Defendants-Appellees lacked the *mens rea* required to establish liability. *See Nat'l Police Ass'n, Inc. v. Gannett Co.* ("*NPA*"), No. 1:21-cv-01116-RLM-DLP, 2022 WL 594918, at *3 (S.D. Ind. Feb. 28, 2022) (noting NPA's apparent concession that the articles at issue were published without

---

[2]  This Court already has held that, if asked to decide whether the single-publication rule applies to statements published on the internet, the Indiana Supreme Court would answer yes—as has nearly every jurisdiction to consider the question. *Pack*, 990 F.3d at 1020.

actual malice). Nor does NPA dispute that, on the date of their publication, the allegedly defamatory articles accurately described the statements of public officials. *Id.* These concessions should end the matter.

Yet, on appeal, NPA asks this Court to adopt a new, novel standard that would contravene the single-publication rule and make the fair-report privilege a nullity: an expanded interpretation of Restatement (Second) of Torts § 577 that NPA calls the "continued-publication rule." Pl. Br. at 16. Under NPA's continued-publication rule, statements that were true or privileged when they were published—like the statements at issue here—can later become defamatory based on post-publication events. *See* Pl. Br. at 27 (explaining that the articles in question *became* defamatory based on post-publication events). Moreover, under NPA's proposed rule, the statute of limitations would not begin to run on the date the allegedly defamatory statement was published; it would begin to run when the publisher learned that the statement was no longer accurate in light of subsequent events. Pl. Br. at 42.

In an attempt to support this radical departure from existing defamation law, NPA relies on a 2021 law review article by Professor Eugene Volokh. Eugene Volokh, *The Duty Not to Continue Distributing Your Own Libels*, 97 Notre Dame L. Rev. 315 (2021) ("*Duty*"). *See, e.g.*, Pl. Br. at 24–26. But NPA's reliance on Professor Volokh's article is misplaced.

Professor Volokh's article imagines an alternative way of applying defamation law to statements made on the internet. For statute-of-limitations purposes, Professor Volokh would apply the single-publication rule as usual to most defamation claims based on online statements: the clock would start ticking on the date of first publication. *Duty*, 97 Notre Dame L. Rev. at 331. Professor Volokh would not, however, require that the *mens rea* element of defamation be present on the date of publication; instead, under Professor Volokh's framework, the *mens rea* element could be satisfied by the publisher's *post*-publication mental state. *Id.* at 330. Thus, Professor Volokh proposes that if a publisher receives reliable evidence that an online statement is false and unprivileged, yet refuses to remove or modify the statement, then the publisher may be liable for defamation—even if the publisher didn't know the statement was false at the time of publication. *Id.*

As an initial matter, Professor Volokh's article does not purport to describe existing law: rather, it explores ways in which legislative or judicial authorities might *modify* existing law. *Id.* at 325. And although Professor Volokh advances policy arguments in favor of these modifications, he candidly acknowledges that countervailing policy arguments exist, and he does not

represent that any court or legislative body has adopted his proposals.[3] *E.g.*, *id.* at 328–29.

In any event, it is neither necessary nor appropriate to debate Professor Volokh's policy judgments in this forum, because—for the reasons stated above and by the District Court—the law clearly requires dismissal of NPA's complaint. But even if it were otherwise, Professor Volokh's academic work would be no help to NPA, because NPA's proposed continued-publication rule is not consistent with Professor Volokh's theses. This is clearest in the following two respects.

First, under NPA's proposed rule, a speaker could be liable for publishing a true or privileged statement—for example, as here, an accurate report of a police department's public alert—if circumstances changed five years later, such that the statement, while true or privileged at the time of publication, would not be true or privileged if published today. *See NPA*, 2022 WL 594918, at *3 (noting NPA's concession that all of the articles at issue were subject to the fair-report privilege on the date of publication). By contrast, Professor Volokh's proposed rule would apply only to online statements that

_____

[3]   With all due respect to Professor Volokh, who is a respected scholar of First Amendment and free-speech issues, amici submit that his article underestimates the burden that his proposed modifications of defamation law would place on journalists' speech—especially independent and local journalists.

were false and/or not privileged on the day they were published. *See, e.g.*, *Duty*, 97 Notre Dame L. Rev. at 320 (false as of publication); *id.* at 334 (accurate but not privileged as of publication).

Second, under NPA's proposed rule, the statute of limitations on a claim of defamation would begin to run whenever a claimant provides a publisher with evidence that a previously published statement is no longer accurate. Pl. Br. at 44. NPA would place no temporal limitation on this accrual date: it could be one, five, ten, or twenty years after the date of the statement's publication. *Id.* Professor Volokh, as noted above, would follow the single-publication rule for statute-of-limitations purposes: the limitations period would start on the date of first publication.[4] *Duty*, 97 Notre Dame L. Rev. at 331 ("I do think that it makes sense for the *statute of limitations* to run from the time of publication." (emphasis in original)).

---

[4]  Professor Volokh would treat reports of legal proceedings differently. *See Duty*, 97 Notre Dame L. Rev. at 343–49. He proposes that an article accurately describing a "legally inculpatory decision[]" of a court may become defamatory after the fact if the publisher fails to update the article with subsequent "exculpatory information." *Id.* at 346. In these circumstances, Professor Volokh would not use the single-publication rule to calculate the statute of limitations. *Id.* at 346–47. Setting aside the workability of Professor Volokh's proposal and its relationship to the fair-report privilege, it is irrelevant to NPA's claims, which do not involve inculpatory or exculpatory legal proceedings. *See id.* at 348 (proposing a definition of "exonerating legal development").

In sum, under the continued-publication rule proposed by NPA, an online publisher could be liable for defamation based on the publication of any statement—no matter how old—that was true or privileged at the time of publication but would not (according to the claimant) be true or privileged if published today. Such a rule would expand the tort of defamation beyond recognition; indeed, it would "eviscerate" both the statute of limitations and the fair-report privilege, "expos[ing] online publishers to potentially limitless liability." *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 615 (7th Cir. 2013). This Court has refused to countenance that result before, *id.*, and for the same reasons, it should refuse to do so now.

## II.    The continued-publication rule proposed by NPA would have a profound chilling effect on constitutionally protected speech.

The Supreme Court has repeatedly "emphasize[d] the special and constitutionally recognized role of . . . [the press] in informing and educating the public." *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 781 (1978); *see also Saxbe v. Wash. Post Co.*, 417 U.S. 843, 863 (1974) (Powell, J., dissenting) ("[The press] is the means by which the people receive that free flow of information and ideas essential to intelligent self-government."); *Mills v. Alabama*, 384 U.S. 214, 219 (1966) ("The Constitution specifically selected the press . . . to play an important role in the discussion of public affairs." (discussing *Lovell v. City of Griffin*, 303 U.S. 444 (1938))).

If NPA's proposed continued-publication rule became law, it would imperil the news media's ability to carry out this important role. Under NPA's proposed rule, any news article that accurately reported a public official's newsworthy comments could, at some point in the future, be transformed from non-defamatory to defamatory based on events that were unknowable at the time of publication. As a result, news publishers would be obliged to conduct resource-draining investigations into claims of inaccuracy made months, years, or decades after an article's appearance. Such investigations would pull time, money, and personnel away from the normal business of journalism, draining already-limited newsroom resources that would be better spent on newsgathering and reporting on current matters of public interest.

Indeed, the past decade has been marred by a crisis in local journalism, as declining circulation has led to dramatic budget shortfalls. Clara Hendrickson, *Local Journalism in Crisis: Why America Must Revive Its Local Newsrooms*, Brookings (Nov. 12, 2019), https://perma.cc/W9X4-GHPQ. Between 2008 and 2018, newspaper advertising revenue dropped by 68 percent. *Id.* In response, newsrooms have been forced to lay off staff or close down entirely. *Id.* This has led to a sharp decline in the ability of news outlets to dedicate resources to investigative reporting. *Id.*  NPA's proposed rule would divert already scarce resources from investigating and reporting on

11

current events to researching and investigating assertions that statements published decades earlier were no longer accurate, either in whole or in part, in light of subsequent developments.

Moreover, under NPA's proposed rule, even the most diligent and meticulous reporting would take on an unknowable, but potentially immense, risk of liability. Journalists and publishers would be forced to weigh the interest in their reporting against the knowledge that no degree of accuracy or good faith may shield them from tort liability two, ten, or twenty years down the road, should a newsworthy statement made today be disproved or withdrawn at some point in the future. Powerful individuals and corporations have long used libel suits to discourage critical news coverage, retaliate against the press, and stymie public discourse. As Harvard Law School Professor Yochai Benkler recently explained, "the history of defamation is certainly one in which people in power try to slap down critics." Michael M. Grynbaum, *Lawsuits Take the Lead in Fight Against Disinformation*, N.Y. Times (Feb. 6, 2021), https://nyti.ms/3uKxh6c. There can be little doubt that such retaliatory suits would proliferate if NPA's proposed continued-publication rule became law, because almost any critical statement made online about a prominent figure or organization would become potential tort fodder, regardless of whether it was actionable at the time of its publication. As this Court has

observed, "the Internet's greater reach comes with an even greater potential for endless retriggering of the statute of limitations, multiplicity of suits and harassment of defendants." *Pippen*, 734 F.3d at 616 (citation and internal quotation marks omitted). The resulting litigation expenses would tax the already limited resources of larger news media companies, and threaten to utterly deplete the shoestring budgets of smaller, local publications.

When media organizations are forced to spend time and money defending against libel claims based on their reporting, their output suffers, scarce financial resources are diverted away from journalism, and readers lose access to valuable content.

## CONCLUSION

For the foregoing reasons, amici respectfully urge this Court to affirm the District Court's dismissal of NPA's claims and to reject NPA's proposed continued-publication rule—a rule irreconcilable with our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

Dated:  September 27, 2022

Respectfully submitted,

*/s/ Katie Townsend*

Katie Townsend
    *Counsel of Record for Amici Curiae*
Shannon A. Jankowski*
Charles Hogle*
REPORTERS COMMITTEE FOR
    FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310
ktownsend@rcfp.org

*\* Of Counsel*

# APPENDIX A

## SUPPLEMENTAL STATEMENT OF IDENTITY OF AMICI CURIAE

**The Reporters Committee for Freedom of the Press** is an unincorporated nonprofit association. The Reporters Committee was founded by leading journalists and media lawyers in 1970 when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources. Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists.

**American Broadcasting Companies, Inc.** is a broad-based communications company. Alone or through its subsidiaries, it owns ABC News, abcnews.com, and local broadcast television stations that regularly gather and report news to the public. ABC News produces the television programs *World News with David Muir*, *Good Morning America*, *Nightline*, *20/20*, and *This Week*, among others.

**Association of Alternative Newsmedia** ("AAN") is a not-for-profit trade association which represents nearly 100 alternative newspapers across North America.  There are a wide range of publications in AAN, but all

share an intense focus on local news, culture and the arts; an emphasis on point-of-view reporting and narrative journalism; a tolerance for individual freedoms and social differences; and an eagerness to report on issues and communities that many mainstream media outlets ignore. AAN members speak truth to power.

**The Atlantic Monthly Group LLC** is the publisher of *The Atlantic* and TheAtlantic.com. Founded in 1857 by Oliver Wendell Holmes, Ralph Waldo Emerson, Henry Wadsworth Longfellow and others, *The Atlantic* continues its 160-year tradition of publishing award-winning journalism that challenges assumptions and pursues truth, covering national and international affairs, politics and public policy, business, culture, technology and related areas.

**Axios Media Inc.** is a digital media company with a mission to deliver news in an efficient format that helps professionals get smarter faster across an array of topics, including politics, science, business, health, tech, media, and local news.

**Boston Globe Media Partners, LLC** publishes The Boston Globe, the largest daily newspaper in New England.

**BuzzFeed, Inc.** is a social news and entertainment company that provides shareable breaking news, original reporting, entertainment, and video across the social web to its global audience of more than 200 million.

**Californians Aware** is a nonpartisan nonprofit corporation organized under the laws of California and eligible for tax exempt contributions as a 501(c)(3) charity pursuant to the Internal Revenue Code.  Its mission is to foster the improvement of, compliance with and public understanding and use of, the California Public Records Act and other guarantees of the public's rights to find out what citizens need to know to be truly self-governing, and to share what they know and believe without fear or loss.

**The Center for Investigative Reporting (d/b/a Reveal)**, founded in 1977, is the nation's oldest nonprofit investigative newsroom. Reveal produces investigative journalism for its website https://www.revealnews.org/, the Reveal national public radio show and podcast, and various documentary projects. Reveal often works in collaboration with other newsrooms across the country.

**Courthouse News Service** is a California-based legal news service that publishes a daily news website with a focus on politics and law.  The news service also publishes daily reports on new civil actions and appellate rulings

in both state and federal courts throughout the nation.  Subscribers to the daily reports include law firms, universities, corporations, governmental institutions, and a wide range of media including newspapers, television stations and cable news services.

**The E.W. Scripps Company** is the nation's fourth-largest local TV broadcaster, operating a portfolio of 61 stations in 41 markets, including WRTV-TV in Indianapolis. Scripps also owns Scripps Networks, which reaches nearly every American through the national news outlets Court TV and Newsy and popular entertainment brands ION, Bounce, Grit, Laff and Court TV Mystery. The company also runs an award-winning investigative reporting newsroom in Washington, D.C., and is the longtime steward of the Scripps National Spelling Bee.

**First Amendment Coalition** (FAC) is a nonprofit public interest organization dedicated to defending free speech, free press and open government rights in order to make government, at all levels, more accountable to the people. The Coalition's mission assumes that government transparency and an informed electorate are essential to a self-governing democracy. FAC advances this purpose by working to improve governmental compliance with state and federal open government

laws. FAC's activities include free legal consultations on access to public records and First Amendment issues, educational programs, legislative oversight of California bills affecting access to government records and free speech, and public advocacy, including extensive litigation and appellate work. FAC's members are news organizations, law firms, libraries, civic organizations, academics, freelance journalists, bloggers, activists, and ordinary citizens.

**First Look Institute, Inc.** is a non-profit digital media venture that produces The Intercept, a digital magazine focused on national security reporting. First Look Institute operates the Press Freedom Defense Fund, which provides essential legal support for journalists, news organizations, and whistleblowers who are targeted by powerful figures because they have tried to bring to light information that is in the public interest and necessary for a functioning democracy.

**Freedom of the Press Foundation** (FPF) is a non-profit organization that supports and defends public-interest journalism in the 21st century.  FPF works to preserve and strengthen First and Fourth Amendment rights guaranteed to the press through a variety of avenues, including building

privacy-preserving technology, promoting the use of digital security tools, and engaging in public and legal advocacy.

**Hearst** is one of the nation's largest diversified media, information and services companies with more than 360 businesses. Its major interests include ownership of 15 daily and more than 30 weekly newspapers, including the San Francisco Chronicle, Houston Chronicle, and Albany Times Union; hundreds of magazines around the world, including Cosmopolitan, Good Housekeeping, ELLE, Harper's BAZAAR and O, The Oprah Magazine; 31 television stations such as KCRA-TV in Sacramento, Calif. and KSBW-TV in Monterey/Salinas, CA, which reach a combined 19 percent of U.S. viewers; ownership in leading cable television networks such as A&E, HISTORY, Lifetime and ESPN; global ratings agency Fitch Group; Hearst Health; significant holdings in automotive, electronic and medical/pharmaceutical business information companies; Internet and marketing services businesses; television production; newspaper features distribution; and real estate.

**The Investigative Reporting Workshop**, based at the School of Communication (SOC) at American University, is a nonprofit, professional newsroom. The Workshop publishes in-depth stories at

investigativereportingworkshop.org about government and corporate accountability, ranging widely from the environment and health to national security and the economy.

**Los Angeles Times Communications LLC** is one of the largest daily newspapers in the United States. Its popular news and information website, www.latimes.com, attracts audiences throughout California and across the nation.

**The McClatchy Company, LLC** is a publisher of iconic brands such as the *Miami Herald*, *The Kansas City Star*, *The Sacramento Bee*, *The Charlotte Observer*, *The* (Raleigh) *News & Observer*, and the *Fort Worth Star-Telegram*. McClatchy operates media companies in 30 U.S. markets in 16 states, providing each of its communities with high-quality news and advertising services in a wide array of digital and print formats.  McClatchy is headquartered in Sacramento, California.

**The Media Institute** is a nonprofit foundation specializing in communications policy issues founded in 1979.  The Media Institute exists to foster three goals: freedom of speech, a competitive media and communications industry, and excellence in journalism.  Its program agenda

encompasses all sectors of the media, from print and broadcast outlets to cable, satellite, and online services.

**Mother Jones** is a nonprofit, reader-supported news organization known for ground-breaking investigative and in-depth journalism on issues of national and global significance.

**The National Press Club** is the world's leading professional organization for journalists. Founded in 1908, the Club has 3,100 members representing most major news organizations. The Club defends a free press worldwide. Each year, the Club holds over 2,000 events, including news conferences, luncheons and panels, and more than 250,000 guests come through its doors.

**The National Press Club Journalism Institute** is the non-profit affiliate of the National Press Club, founded to advance journalistic excellence for a transparent society. A free and independent press is the cornerstone of public life, empowering engaged citizens to shape democracy. The Institute promotes and defends press freedom worldwide, while training journalists in best practices, professional standards and ethical conduct to foster credibility and integrity.

**The National Press Photographers Association** ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing and distribution.  NPPA's members include television and still photographers, editors, students and representatives of businesses that serve the visual journalism industry. Since its founding in 1946, the NPPA has vigorously promoted the constitutional rights of journalists as well as freedom of the press in all its forms, especially as it relates to visual journalism. The submission of this brief was duly authorized by Mickey H. Osterreicher, its General Counsel.

**New England Newspaper and Press Association, Inc**. ("NENPA") is the regional association for newspapers in the six New England States (including Massachusetts). NENPA's corporate office is in Dedham, Massachusetts.  Its purpose is to promote the common interests of newspapers published in New England.  Consistent with its purposes, NENPA is committed to preserving and ensuring the open and free publication of news and events in an open society.

**The New York Times Company** is the publisher of *The New York Times* and *The International Times*, and operates the news website nytimes.com.

**The News Leaders Association** was formed via the merger of the American Society of News Editors and the Associated Press Media Editors in September 2019.  It aims to foster and develop the highest standards of trustworthy, truth-seeking journalism; to advocate for open, honest and transparent government; to fight for free speech and an independent press; and to nurture the next generation of news leaders committed to spreading knowledge that informs democracy.

**The News/Media Alliance** represents news and media publishers, including nearly 2,000 diverse news and magazine publishers in the United States—from the largest news publishers and international outlets to hyperlocal news sources, from digital-only and digital-first to print news. Alliance members account for nearly 90% of the daily newspaper's circulation in the United States.   Since 2022, the Alliance is also the industry association for magazine media.  It represents the interests of close to 100 magazine media companies with more than 500 individual magazine brands, on topics that include news, culture, sports, lifestyle and virtually every other interest, avocation or pastime enjoyed by Americans.  The Alliance diligently advocates for news organizations and magazine publishers on issues that affect them today.

**Newsday LLC** ("Newsday") is the publisher of the daily newspaper, Newsday, and related news websites.  Newsday is one of the nation's largest daily newspapers, serving Long Island through its portfolio of print and digital products. Newsday has received 19 Pulitzer Prizes and other esteemed awards for outstanding journalism.

**The News Guild-CWA** is a labor organization representing more than 25,000 employees of newspapers, newsmagazines, news services and other media enterprises. Guild representation comprises, in the main, the editorial and online departments of these media outlets. The News Guild is a sector of the Communications Workers of America. CWA is America's largest communications and media union, representing over 500,000 men and women in both private and public sectors.

**The Online News Association** is the world's largest association of digital journalists.  ONA's mission is to inspire innovation and excellence among journalists to better serve the public.  Membership includes journalists, technologists, executives, academics and students who produce news for and support digital delivery systems.  ONA also hosts the annual Online News Association conference and administers the Online Journalism Awards.

**Open Vallejo** is an award-winning, independent, non-partisan, nonprofit newsroom serving the public interest. Open Vallejo seeks to illuminate a small city long burdened by police violence, corruption, and neglect. As the first project of the Informed California Foundation, Open Vallejo is also a permanent design laboratory for open source, high-impact, broadly-accessible frameworks for ensuring local transparency, accountability, and information justice.

**Pro Publica, Inc.** ("ProPublica") is an independent, nonprofit newsroom that produces investigative journalism in the public interest. It has won six Pulitzer Prizes, most recently a 2020 prize for national reporting, the 2019 prize for feature writing, and the 2017 gold medal for public service. ProPublica is supported almost entirely by philanthropy and offers its articles for republication, both through its website, propublica.org, and directly to leading news organizations selected for maximum impact. ProPublica has extensive regional and local operations, including ProPublica Illinois, which began publishing in late 2017 and was honored (along with the Chicago Tribune) as a finalist for the 2018 Pulitzer Prize for Local Reporting, an initiative with the Texas Tribune, which launched in March 2020, and a series of Local Reporting Network partnerships.

**Radio Television Digital News Association** ("RTDNA") is the world's largest and only professional organization devoted exclusively to electronic journalism. RTDNA is made up of news directors, news associates, educators and students in radio, television, cable and electronic media in more than 30 countries. RTDNA is committed to encouraging excellence in the electronic journalism industry and upholding First Amendment freedoms.

**Reuters**, the news and media division of Thomson Reuters, is the world's largest multimedia news provider. Founded in 1851, it is committed to the Trust Principles of independence, integrity and freedom from bias. With unmatched coverage in over 16 languages, and reaching billions of people worldwide every day, Reuters provides trusted intelligence that powers humans and machines to make smart decisions. It supplies business, financial, national and international news to professionals via desktop terminals, the world's media organizations, industry events and directly to consumers.

**The Seattle Times Company**, locally owned since 1896, publishes the daily newspaper *The Seattle Times*, together with the *Yakima Herald-Republic* and *Walla Walla Union-Bulletin*, all in Washington state.

**The Slate Group** publishes Slate, a daily online magazine. Slate features articles and podcasts analyzing news, politics and contemporary culture.

**The Society of Environmental Journalists** is the only North-American membership association of professional journalists dedicated to more and better coverage of environment-related issues.

**TEGNA Inc.** owns or services (through shared service agreements or other similar agreements) 64 television stations in 52 markets, including WTHR-TV in Indianapolis.

**Tribune Publishing Company** is one of the country's leading media companies. The company's daily newspapers include the Chicago Tribune, New York Daily News, The Baltimore Sun, Sun Sentinel (South Florida), Orlando Sentinel, Hartford Courant, The Morning Call, the Virginian Pilot and Daily Press. Popular news and information websites, including www.chicagotribune.com, complement Tribune Publishing's publishing properties and extend the company's nationwide audience.

**The Tully Center for Free Speech** began in Fall, 2006, at Syracuse University's S.I. Newhouse School of Public Communications, one of the nation's premier schools of mass communications.

## CERTIFICATE OF COMPLIANCE

I, Katie Townsend, do hereby certify that the foregoing brief of amici curiae:

1.  Complies with the type volume limitation of Cir. R. 29 because it contains 5,255 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as calculated by the word-processing system used to prepare the brief; and

2.  Complies with the type face requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point, Calisto MT font.

Dated:  September 27, 2022

*/s/ Katie Townsend*
Katie Townsend
*Counsel of Record for Amici Curiae*

## CERTIFICATE OF SERVICE

I, Katie Townsend, hereby certify that I have filed the foregoing Brief of Amici Curiae electronically with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the appellate CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:  September 27, 2022

/s/ Katie Townsend
Katie Townsend
*Counsel of Record for Amici Curiae*