In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 22-1639

NATIONAL POLICE ASSOCIATION, INC.,

*Plaintiff-Appellant*,

*v.*

GANNETT CO., INC., ET AL.,

*Defendants-Appellees*.

———————————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:21-cv-01116-RLM-DLP — **Robert L. Miller, Jr.**, *Judge*.

———————————

ARGUED NOVEMBER 30, 2022 — DECIDED AUGUST 31, 2023

———————————

Before WOOD, JACKSON-AKIWUMI, and LEE, *Circuit Judges*.

JACKSON-AKIWUMI, *Circuit Judge*. The National Police Association ("NPA") is a non-profit organization that describes its purpose as "educat[ing] supporters of law enforcement in how to help police departments accomplish their goals." In 2018 and 2019, a handful of police departments around the country took issue with fundraising mailers the NPA sent residents; the departments characterized the solicitations as deceptive. *The Indianapolis Star* and the Associated Press

reported on the alerts issued by these police departments. In response, the NPA sued the publishers, alleging their reports were libelous. The organization lost when the district court dismissed its case, but it presses its theory on appeal—one based on a novel interpretation of the Restatement (Second) Torts § 577(2). In short, the NPA suggests the Restatement creates a requirement that internet publishers remove previously published libelous information. The NPA even asks that we certify questions to the Indiana Supreme Court to confirm that such a duty exists in Indiana. But because this alleged duty lacks doctrinal support, we decline to certify the questions and affirm the district court's dismissal of this case.

**I**

The NPA is a non-profit formed in 2017. It makes public service announcements, publishes various media, and prepares legal filings on behalf of police officers and police departments to help law enforcement agencies.

In May 2018, the Police Department of Germantown, Wisconsin, posted a "scam alert" on its Facebook page flagging NPA solicitations. The Police Department of Trenton, Michigan, did the same in February 2019.

*The Indianapolis Star*, owned by defendant-appellee Gannett Company, Inc, reported on the police department alerts a month later. The article ran on March 17, 2019, and was titled "This Indianapolis charity says it helps police. Police chiefs say it's a scam." Referencing alerts issued by several police departments, the article focused on whether the money NPA raised truly went to police departments in the municipalities where it mailed solicitations. The article highlighted statements in NPA mailers sent to residents of two towns that

falsely characterized the towns as sanctuary cities. The article quoted nonprofit experts who expressed measured skepticism of the NPA based on publicly available tax filings, and it noted that various Indianapolis police organizations and the national Fraternal Order of Police were generally unaware of the NPA. The *Star* also sought rebuttal comment from the president of the NPA; spoke to an attorney listed as the NPA's treasurer; and quoted a sheriff the NPA provided to the newspaper as a positive reference, who detailed assistance the organization provided to his department.

The next day—March 18, 2019—the AP published a wire story on the same allegations covered by the *Star*, titled "Police question authenticity of nonprofit's fundraising." The NPA characterizes the reporting in the AP and the *Star* stories as defamatory given they insinuate the NPA is a fraudulent or dubious organization.

In the year and a half after the two stories were published, the NPA began a campaign of extracting apparent retractions of the "scam" alerts the *Star* and the AP reported on. In May 2019, a few months after the articles ran, the Trenton Police Department updated its Facebook post. The revised post acknowledged the NPA "is an official organization". But the revised post also declared that the police department does not receive money from the NPA, and it cryptically advised, "Please do your own homework when donating to any charitable cause or organization." The NPA viewed the revised post as a retraction of the police department's original alert, noting that the reference to a "scam" was removed.

On June 21, 2019, the NPA sued the City of Trenton and two of its officers based on their statements included in the *Star*'s March 17 story. After these lawsuits were filed, the *Star*

returned to the story, writing a follow-up on July 15 titled, "A pro-police Indianapolis nonprofit is suing 2 police officers." In this subsequent article, the paper recapped its reporting on the initial scam allegations.

As a part of its retraction campaign, the NPA also sued the Germantown Police Department, and extracted from Steven R. Kreklow, Village Administrator of Germantown, a statement noting that although Germantown proper was not a sanctuary city, it was a part of the Milwaukee metro area—where other municipalities had sanctuary policies.[1] The NPA also presents this statement as a retraction of the Germantown police chief's original statement that the mailers were misleading.

With statements in hand from Trenton, Germantown, and the City of Belle Isle, Florida (which also described the NPA mailers as misleading in the original *Star* story), counsel for the NPA sent a letter to Gannett, the publisher of *The Indianapolis Star*, and to the AP's Indiana office and general counsel, providing notice under Indiana Code § 34-15-4-2 that the NPA considered the three articles defamatory and intended to sue. The letter sought a retraction and removal of public access to online copies of the stories. Both letters pointed to the legal theory that would drive the suit: "Under the modern rule of continuing publication, a defamatory statement is deemed to be republished if, after becoming aware of its false and defamatory nature, the publisher leaves the publication

---

[1] The NPA's defense of these letters relies on the nuance of the Department of Homeland Security describing Germantown and Belle Isle as "sanctuary area[s]", even though those designations refer to different governmental units than the municipalities alone.

on the publisher's website subject to continuing access by third parties." In-house counsel for Gannett and the AP responded to the near-identical letters on February 23 and March 1, 2021, respectively. They disagreed with NPA's claim of defamation and stated they were prepared to defend the stories in potential litigation. The NPA filed its complaint on May 3, 2021.

The district court granted the publishers' motion to dismiss for three reasons. First, it held that the NPA's suit would fail under traditional defamation doctrines, given the organization never alleged "actual malice"—that the publishers were aware of an inaccuracy or had serious doubts about the accuracy of the material—when the stories were first published. *Nat'l Police Ass'n, Inc. v. Gannett Co.*, No. 1:21-CV-1116 RLM-DLP, 2022 WL 594918, at *3 (S.D. Ind. Feb. 28, 2022).

Second, the district court was skeptical of the reasoning underlying the libel claim. The NPA predicated its suit on a novel application of the Restatement (Second) of Torts § 577(2),[2] which imposes liability for landowners who do not remove defamatory content on their property. NPA sought to apply this to the context of internet publications, backed by this court's decision in *Tacket v. General Motors Corporation*,

---

[2] The Restatement is a recapitulation of established legal norms across states that is not mandatory and does not have the force of statute, especially since "different jurisdictions may, and often do, go their separate ways." *Next Techs. Inc. v. Beyond the Off. Door, LLC*, 992 F.3d 589, 593 (7th Cir. 2021). Even so, when a state has not explicitly taken a contrary position on an area of law, it is usually safe to assume that it would follow the Restatement. *Id.* (citing *Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1107 (7th Cir. 2014)). The parties here have adopted that approach, so we will do the same.

which predicted (incorrectly, at least to date) that Indiana would adopt § 577(2). 836 F.2d 1042, 1046 (7th Cir. 1987). The district court held that neither authority applied in this case, as the NPA's proposed "continued publication" rule was an attempt to conflate doctrine relating to a party's adoption of another's statement (the Restatement and *Tacket*) with a party's failure to retract one's own statement (the scenario here, the district court said). *Nat'l Police Ass'n, Inc. v. Gannett Co.*, 2022 WL 594918, at *4.

Third, the district court determined that absent a basis for liability under § 577(2), the single publication rule, which limits libel liability to the first publication of a work, foreclosed the NPA's claim. *Id.* The court noted that the NPA failed to provide a limiting principle to its reading of § 577(2): if "failure to retract" created a claim, the court noted, liability could be created at any point after publication, thus undermining the single publication principle. *Id.*

## II

On appeal, the NPA reiterates its claim that the Restatement (Second) of Torts § 577(2) provides a basis for its claims against Gannett and the AP. Before addressing this theory, it is useful to recap the basics of a libel claim under Indiana law. A plaintiff in such a suit must plead "(1) a communication with a defamatory imputation; (2) malice; (3) publication; and (4) damages." *Haegert v. McMullan*, 953 N.E.2d 1223, 1230 (Ind. Ct. App. 2011). For matters of public or general concern (as in this case, the NPA agrees), the claimant must prove the entity acted with actual malice in publishing the material. *J.-Gazette Co. v. Bandido's, Inc.*, 712 N.E.2d 446, 451–52 (Ind. 1999). Actual malice refers to the publisher's "knowledge that [the statement] was false" or "reckless disregard of whether it

was false or not." *Id.* at 451 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964)).

The NPA challenges not the original publication of the articles, but the "continued publication of them online after Publishers were notified that they were defamatory." In other words, the NPA argues that a claim of defamation predicated exclusively on events that happen *after* the article is published can be valid. For this claim, the NPA relies on a purported blank space in libel doctrine: how to deal with libelous content published online. Into this alleged blank space, the NPA inserts its reading of the Restatement (Second) of Torts § 577(2) and *Tacket*. However, this "blank" space is illusory; the single publication rule, which limits libel liability to the first publication of a work, has been applied to online material across the country, including in this circuit. *See, e.g., Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 615 (7th Cir. 2013) ("Every state court that has considered the question applies the single-publication rule to information online.") These authorities control here as well.

The NPA cites the Restatement (Second) of Torts § 577(2), which states, "One who intentionally and unreasonably fails to remove defamatory matter that he knows to be exhibited on land or chattels in his possession or under his control is subject to liability for its continued publication." NPA claims that the language of § 577(2) creates a duty to remove defamatory material from one's chattels "regardless of author." NPA argues the phrasing of § 577(2) should be inclusive of one's own defamatory matter because the provision lacks language explicitly stating that the duty to remove defamatory material only applies to third party statements. The problem with this interpretation is that the context surrounding §

577(2)—from the comment to the illustration to the lack of precedent adopting the NPA's argument—points in the opposite direction.

The true meaning of § 577(2)—despite the textual artifacts NPA fixates on—is revealed by its accompanying commentary. Comment p of the Restatement states that the basis of liability under § 577(2) is "[the landowner's] duty not to permit the use of his land or chattels for a purpose damaging to others outside of the land." RESTATEMENT (SECOND) OF TORTS § 577 cmt. p (1977). The comment goes on to analogize the provision to the duty in § 362(c) "to use reasonable care to remedy a condition upon the defendant's land **created by another,** which involves unreasonable danger to those outside of the land." *Id.* (emphasis added). The illustration for § 577(2) is more explicit: it discusses a bar owner's liability for failing to remove bathroom graffiti impugning the chastity of a woman. *Id.* at cmt. p, illus. 15; *see also Hellar v. Bianco*, 244 P.2d 757 (Cal. Dist. Ct. App. 1952) (the basis for the illustration). NPA's view that § 577(2) can apply to a property owner's own writings is supported by nothing other than a claim that comment p of the Restatement cannot "trump" the text of the Restatement.

The NPA's reference to our decision in *Tacket v. General Motors Corporation* suffers from the same problems as its invocation of § 577(2): a failure to acknowledge the authority applies only to third-party statements. At the time *Tacket* was decided, no Indiana court had ruled on the § 577(2) approach, so this court had to make a prediction. We guessed that Indiana would follow § 577(2), as "[a]doption of another's publication is an old basis of liability." 836 F.2d at 1046. The plaintiff in *Tacket*, a GM plant manager, had alleged that the

company "adopted" a sign that accused him of corruption by failing to take it down for at least seven months. *Id.* at 1044. Whether GM had "published" the sign by its failure to remove it turned on an application of the Restatement. We ruled that there was enough evidence for a jury upon remand to decide that GM had adopted the sign by failing to remove it after being informed of its existence in an area under GM's control. *Id.* at 1047. In that decision, however, we made no reference to § 577(2) applying to a property owner's own words or material, as opposed to those of a third party, like the person who created the offending sign at the GM plant.

Indiana has not adopted the rule of § 577(2) in the 36 years since *Tacket*. Furthermore, even though that case is too old to have contemplated online publication liability, many other cases have come before courts across the country—including this one—attempting to argue that online articles are subject to defamation liability based on a post-publication notification of falsity. Most of these arguments have been unsuccessful.[3] Two cases before this court merit specific mention.

---

[3] Courts across the country have rejected some version of the argument. *See, e.g., Roberts v. McAfee, Inc.*, 660 F.3d 1156, 1168 (9th Cir. 2011) (rejecting a former general counsel's claim that his former employer defamed him by leaving online a press release implicating him in a stock backdating scandal after related criminal and civil prosecutions were unsuccessful, because allowing any past mass communication to create defamation liability "undermines the single-publication rule" by); *Firth v. State*, 775 N.E.2d 463, 465 (N.Y. 2002) ("The policies impelling the original adoption of the single publication rule support its application to the posting of . . . [a] report regarding claimant on the State's Web site."); *N. Atlanta Golf Operations, LLC v. Ward*, 870 S.E.2d 814, 821 (Ga. Ct. App. 2022) ("In Georgia, the single publication rule governs actions for libel. This includes actions for libel based on statements made on the Internet." (cleaned));

    In the first case, NBA legend Scottie Pippen sued a group
of media organizations arguing that, in covering his lawsuits
against a series of former advisers, the organizations falsely
reported he filed for bankruptcy. *Pippen*, 734 F.3d at 612. Pip-
pen premised his libel claim on a notification he sent to the
publications *after* their reports were published. *Id.* at 614. Ap-
plying Illinois law, we ruled that ex-post notification does not
provide a basis to infer actual malice, and Illinois' codification
of the single publication rule meant a defamation claim was
complete the moment a story was published. This meant that
Pippen was unable to establish actual malice and continue his
libel claim. *Id.* at 614–15. *Pippen* is important, but it applied
Illinois law. However, Indiana courts have also applied the
single publication rule. *See, e.g., Pack v. Truth Publ'g Co.*, 122
N.E.3d 958, 969 (Ind. Ct. App. 2019) ("The act at issue is the
Newspaper's initial publication of the article and whether
that initial publication was in good faith. After-the-fact infor-
mation that could not have played any part in the Newspa-
per's initial publication decision does not matter to that anal-
ysis."); *see also* RESTATEMENT (SECOND) OF TORTS § 577A (3)

---

*Trexler v. The Ass'n Press*, No. 2010CP401249, 2013 WL 9963459, at *3 (S.C.
Com. Pl. Apr. 30, 2013) ("[W]hen presented with the question of the appli-
cation of the single publication rule with respect to publications posted on
the Internet, South Carolina will follow the single publication rule."), *aff'd
on other grounds*, No. 2015-UP-201, 2015 WL 1681002 (S.C. Ct. App. Apr.
15, 2015); *Abate v. Maine Antique Dig.*, No. 03-3759, 2004 WL 293903, at *1
(Mass. Super. Jan. 26, 2004) ("[C]ourts in other states have applied this
single publication rule to generally accessible internet publications. To
hold otherwise and treat internet publications differently would result in
the endless retriggering of the statute of limitations, thus exposing those
who 'publish' information on the internet to a multiplicity of lawsuits and
thereby inhibiting the open dissemination of information and ideas.").

(1977) (showing the broad application of the rule to a wide array of media types).

In the second case, contrary to the NPA's claim that the single publication rule does not conflict with the NPA's formulation of the "continuing publication rule," we predicted that Indiana would apply the single publication rule in situations analogous to this case—namely, where the continued online presence of purportedly defamatory material is at issue. In *Pack v. Middlebury Community Schools*, a teacher who believed he was wrongfully fired reached a settlement with his school district including a forward-looking non-disparagement clause. 990 F.3d 1013, 1018 (7th Cir. 2021). The teacher later sued again, arguing this clause compelled the school to disable public online access to a pre-settlement press release describing his firing. *Id.* We ruled the school was not required to do so—not just because of the contractual language, but also because each additional time someone saw the old press release did not constitute a "new" breach of the agreement. *Id.* at 1020. In other words, we ruled that Indiana courts would apply the single publication rule to a situation analogous to NPA's "continuing publication" argument. *See id.* at 1021 ("We conclude that the Indiana Supreme Court would conclude that the press release is not a new statement each time someone accesses it on the School's website . . . .").

For these reasons, there is no basis for the NPA's theory of liability.

## III

The NPA asks us to certify several questions to the Indiana Supreme Court under Circuit Rule 52(a), chief among them, "Whether Indiana recognizes the continued-publication rule

for defamation as set out in § 577(2) and as *Tacket* predicted it would."[4] However, we certify questions under this rule only if we are "genuinely uncertain about a question of state law that is key to a correct disposition of the case." *In re Hernandez*, 918 F.3d 563, 570 (7th Cir. 2019) (quoting *Lyon Fin. Servs., Inc. v. Ill. Paper & Copier Co.*, 732 F.3d 755, 766 (7th Cir. 2013)). The NPA's questions are simply recitations of its arguments about the "continued publication rule," which we addressed above. There is not enough uncertainty about Indiana law to justify certification of these questions since, as we have already noted, the state follows the single publication rule. For this reason, we decline to certify these questions.

---

[4] The questions the NPA seeks to certify are, in full:

1. Whether Indiana recognizes the continued-publication rule for defamation as set out in § 577(2) and as *Tacket* predicted it would.

2. If so, whether that continued-publication rule includes a duty not to keep distributing one's own libels after one learns online hosted information is defamatory.

3. If so, in situations where (a) one is accused of a crime and false statements, (b) that event is reported in online news, (c) a later event exculpates the accused, and (d) the accused provides notice to the news entity of the exculpatory information and requests retraction, whether the statute of limitations runs from the time of that notice.

4. Whether, in addition to damages, available remedies in such a case include ordered removal, retraction, and/or prominent posting of exculpatory information with the online story if it remains online.

## IV

The NPA asks this court to reverse the district court's dismissal of its libel suit based on an untested, bespoke theory of liability based on an interpretation of the single publication rule that courts have consistently rejected. We decline this invitation. The district court's ruling is **AFFIRMED**.